Messrs. Quinn and Quirk
dissented, and expressed their views, as follows: —
A minority of the joint special commiteee, to whom was referred the returns of the election for councillors and the petition of John H. Sullivan that he may be declared to be duly elected councillor for the fourth councillor district, submits the following report : —
The above report and petition were referred to this committee at two o’clock of the afternoon of Jan. 6, 1897, and the committee at once went into executive session to consider the same, asking counsel for the petitioner and for Isaac B. Allen, who appeared upon the face of the returns to have been elected councillor for the fourth councillor district, to appear before them. An informal discussion was had, in which counsel were asked to state generally the evidence which would be introduced and their position upon the duties of this committee. No other hearing has been had, and counsel for the petitioner were not asked to submit authorities or *102 make arguments upon the effect of the evidence or upon the merits of the controversy.
The petition of Mr. Sullivan sets forth in substance that about three hundred and forty ballots were cast at the election in the fourth councillor district, in which for the office of councillor the name of “Isaac B. Allen, Republican,” appeared upon the first line, and “John H. Sullivan, Democratic,” appeared upon the second line; that there were no other candidates, and that the third line was a blank, against which last line the voters had marked a cross. The single question presented was whether the committee should summon the custodians of these ballots before them, examine the ballots and pass upon the question whether the ballots should be rejected altogether or counted for the petitioner. The constitutional questions involved in this case seem to a minority of the committee so important and so vital to our form of government that they deem it important to present their views in detail.
By the sixteenth amendment to the Constitution of the State the duty is plainly laid upon the Legislature of determining as a court of last resort the election of governor, lieutenant-governor and councillors. The section provides: “Eight councillors shall be annually chosen by the inhabitants of this Commonwealth, qualified to vote for governor. The election of councillors shall be determined by the same rule that is required in the election of governor. . . . And, that there may be no delay in the organization of the government on the first Wednesday of January, the governor, with at least five councillors for the time being, shall, as soon as may be, examine the returned copies of the records for the election of governor, lieutenant-governor and councillors; and ten days before the said first Wednesday in January he shall issue his summons to such persons as appear to be chosen to attend on that day to be qualified accordingly; and the secretary shall lay the returns before the Senate and House of Representatives on the said first Wednesday in January, to be by them examined; and in case of the election of either of said officers, the choice shall be by them declared and published; but in case there shall be no election of either of said officers, the Legislature shall proceed to fill such vacancies in the manner provided in the Constitution for the choice of such officers.”
It is not contended by a majority of the committee that the duty of the Legislature is a mere ministerial one, to verify the returns already verified by the governor and council; but it is conceded, in a proper case, that it is in effect the court of final resort to determine who shall hold the high offices above named. Certainly there could be no doubt upon this question in view of the decision *103 of the Legislature in the case of Rice v. Welch, determined in 1868, where the subject was fully discussed in the report of the committee, whose report was accepted unanimously by the Legislature.
The remaining question, then, is, whether a proper case for investigation has been made by Mr. Sullivan in his petition. It was conceded by counsel for Mr. Allen, and was not questioned by the majority, that, if the petition had alleged fraud in the counting of the ballots, it would have been the duty of the Legislature to examine into the same. The petition clearly sets forth that the Election Commissioners of the city of Boston “unlawfully and without right rejected and refused to count upwards of three hundred and forty votes cast for your petitioner, although duly requested so to do. That the ballots rejected as aforesaid were cast by voters who voted for all other Democratic candidates for election.” It seems to us to make no difference whether this is an allegation of fraud, or merely of mistake. The jurisdiction of courts of equity is, among other things, to correct fraud, accident and mistake; and it cannot be supposed for a moment that the Legislature of Massachusetts, charged with a high duty, can deal only with questions of fraud, and not with other matters which falsify the result of an election. A mistake which deprives a duly elected candidate of his election is of the same public importance as a fraud which accomplishes the same result. Such being the case, it seems to us that it was the duty of the committee to follow the precedent above cited, and report upon the seven councillors whose election was not questioned, and to ask for sufficient time to receive evidence, listen to the arguments of counsel, examine authorities and sufficiently weigh the question involved. It is entirely apparent that this has not been done. Counsel for the petitioner, as above stated, confined themselves to answering the two questions propounded by the committee, and did not go into the merits of the case.
But, passing by this apparently controlling consideration against the report of the majority, we beg further to differ from it upon the merits of the case, even as already presented. It is now beyond question that, under the election laws of this Commonwealth, no voter is to be disfranchised, or his ballot rejected, unless “ a voter marks more names than there are persons to be elected to an office, or if for any reason it is impossible to determine the choice of the voter for any office to be filled.” Both the majority and the minority of the House committee in 1896, in the case of Morgan v. Bleiler (p. 87 ante), stated in most emphatic terms that the intention of the voter was to be ascertained, even if he had *104 failed to conform to the directions of the statute in marking his ballot; and this construction conforms to the decisions in other jurisdictions.
All that it was necessary for this petitioner to show was that he had a prima facie case for examination by the Legislature ; and upon that, it seems to us, there is no room for doubt.
In the case of Morgan v. Bleiler, just referred to, the committee counted, without objection, a ballot marked in precisely the way in which the three hundred and forty ballots mentioned in the petition were marked.
The Legislature of Rhode Island, in the case of Smith v. Landers, in May, 1893, counted ballots marked in precisely the same way, and seated the contestant.
In the Danville election case, Davis v. Morse, in 1892, decided by the Legislature of Vermont, a ballot marked in precisely the same way was counted.
Archibald, P. J., in re-election of John J. Flynn, decided in the Pennsylvania County Court, Jan. 6, 1896, counted two ballots marked in precisely the same way, which controlled the election.
And analagous decisions are found in other countries.
In Woodward, Petr., v. Sarsons et al., L. R. 10 C. P. 733, Lord Chief Justice Coleridge decided that a ballot marked with a cross to the left of the candidate’s name was valid; that another marked with a star instead of a cross was valid; that another marked with an upright dash was valid; that another marked in ink, though the English statute distinctly requires pencil, was valid; that another marked with a cross to the left and above, not opposite to, the candidate’s name, was valid; that another which had three crosses on it was valid; that another with the cross to the right of, but not opposite to, the candidate’s name was valid.
In the face of such decisions as these, the decision of the majority, not even granting a formal hearing to the petitioner, seems to us to establish a most unfortunate and pernicious precedent.
It is impossible to understand why the Legislature in one year should count a ballot marked in a particular way, and in the very next year refuse even to consider the counting of ballots marked in precisely the same way.
In all cases the intention of the voter, if it can be ascertained, should be given effect. The petitioner in this case has simply requested the Legislature to examine the ballots, for the purpose of showing whether or not the intention of the voter, in marking the ballot, was so expressed that it can be given effect. Massachusetts has never failed to follow the rule early laid down by *105 Chief Justice Shaw in the case of Strong, Petr., 22 Pick. 484, that, in determining an election, “ the only object should be to ascertain the expressed will of a majority of the electors, and with this in view, and with the guidance of good practical sense, unfettered by technical rules and nice distinctions, there will be no danger of mistaking the voice of the electors.”
[The report of the committee was accepted.]
We recommend that further consideration of the subject be given by the committee.